UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PETER MCCARTHY and<br>STEPS TO SOLUTIONS, INC.,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 21-11300-DLC<br>)<br>)<br>)<br>)<br>)<br>) |

**THE UNITED STATES' REPLY TO DEFENDANTS' OPPOSITION
TO UNITED STATES' MOTION FOR INJUNCTIVE RELIEF AND CIVIL PENALTY**

There is a lengthy history of federal courts across the country requiring injunctions in cases like this one. Indeed, since 2000, in *every* Fair Housing Act case alleging sexual harassment where the United States has prevailed at trial, the court has ordered an injunction. And in the sole instance where, as part of that injunction, a court did not order the defendant to retain a private management company, the defendant had already sold all his properties and no longer operated as a landlord. In every other case, the court not only entered an injunction but also required the defendant to retain a private management company to operate his properties. Thus, the Court would be departing from a well-worn path if it decides not to enter an injunction requiring Defendant McCarthy to retain a private management company to operate his sober homes.

Should the Court deny the government's requested, and warranted, injunction—and should the Court also accept at face value Defendant McCarthy's mere say-so regarding his financial condition, there would be no restraint in place to keep Defendant McCarthy from

engaging in the same reprehensible behavior yet again. While the jury's award of damages both compensates the aggrieved parties for the harm Defendant McCarthy inflicted upon them and punishes Mr. McCarthy for *that* harm, it does not preclude such conduct from happening *in the future*. The only thing that can prevent Defendant McCarthy from continuing to sexually harass women is equitable relief in the form of an injunction.

In considering the harm an injunction might cause the Defendants by enjoining Defendant McCarthy from operating (though still profiting from) his company, the Court risks ignoring the irreparable harm McCarthy already has inflicted on the public by using this very same company, and his position within it, to cause such harm. Moreover, the law is clear that irreparable harm is *presumed*. Rather than afford McCarthy any benefit of the doubt, the Court should take the necessary steps to ensure that the Defendants do not visit further harms on vulnerable women.[1]

1. **The Jury Found Defendant McCarthy Liable For Violating The Fair Housing Act; As Such, An Injunction Preventing Him From Further Harming Women Is Necessary**

Because of the jury's finding, the Court should presume that Defendant McCarthy caused irreparable harm. *See Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) ("[W]here a plaintiff demonstrates a likelihood of success on the merits of a fair housing claim, irreparable harm may be presumed.") (citations omitted); *Stewart B.*

---

[1] In their Opposition to the United States' Motion for Injunctive Relief and Civil Penalty, Defendants argue that the Court has no jurisdiction to adjudicate the United States' request for an injunction because Defendants filed a notice of appeal. (Dkt. No. 125 at 2). Defendants forget that the Court already has determined that it does have jurisdiction, which rendered Defendants' *pro se* motions moot. (Dkt. No. 121). Rule 4(a)(4)(b) is clear that Defendants' notice of appeal is stayed pending the Court's adjudication of the parties' post-trial motions. Fed. R. App. P. 4(a)(4)(b)

*McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1208 (D. Conn. 1992) ("[I]rreparable harm may be presumed in this case because. . . the plaintiff has presented sufficient evidence to establish that its rights under the [Fair Housing] Act have been violated."); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("We agree with the district court that irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes.").

Some courts have held that FHA plaintiffs are not even required to demonstrate irreparable harm where they seek equitable relief to prevent violation of a statute, like the FHA, that specifically provides for injunctive relief. *See, e.g., North Shore-Chicago Rehabilitation, Inc. v. Village of Skokie*, 827 F. Supp. 497, 509 (N.D. Ill. 1993) ("Where a plaintiff has shown a likelihood of success in proving a violation of the Fair Housing Act, irreparable injury is presumed. Furthermore, . . . where a statute specifically provides for the grant of injunctive relief, irreparable injury need not be shown."); *Baxter v. City of Belleville, Ill.*, 720 F. Supp. 720, 734 (S.D. Ill. 1989). *See also, United States v. Massachusetts Water Res. Auth.*, 256 F.3d 36, 51 n. 15 (1st Cir. 2001) ("At least with respect to some statutory injunction provisions, however, courts have found that when Congress decides to make available the remedy of injunction for violations of a statute's substantive provisions, irreparable injury is presumed to flow from such violations.") The Fair Housing Act expressly authorizes the issuance of "preventative relief, including a temporary or permanent injunction," to remedy a pattern or practice of discrimination. 42 U.S.C. § 3614(d)(1)(A). Congress intended for courts to issue such injunctions to protect the public. Indeed, courts in civil rights cases have "not merely the power *but the duty* to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Int'l Bhd. of Teamsters v. United*

3

*States*, 431 U.S. 324, 364 (1977) (quoting *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (emphasis added)). *See also United States v. Balistrieri*, 981 F.2d 916, 934 (7th Cir. 1992) (proof of a pattern or practice of discrimination in violation of the FHA "creates a presumption that an injunction is appropriate").

In the hearing on August 8, the Court queried whether an injunction would be appropriate in the absence of evidence of current harm. Requiring that a plaintiff show evidence of continued harm throughout the litigation process, from discovery through trial, and even post-trial, to justify a permanent injunction, would place an undue burden on the plaintiff that few litigants could meet, and the law does not require it. *See supra* at 3. Here, where the jury already found that Defendant McCarthy engaged in a pattern or practice of sexual harassment, the United States has already met the burden (assuming there is one) to justify a permanent injunction. In *International Brotherhood of Teamsters*, a Title VII case about race- and ethnicity-based discrimination in the workplace, the Supreme Court noted that a "finding of a pattern or practice justifies an award of prospective relief" even "[w]ithout any further evidence from the Government." 431 U.S. at 361.

As already noted, in *every* case where the United States has won at trial in a claim involving sexual harassment in housing, the court has granted an injunction. In none of these cases has the court required an evidentiary hearing demonstrating ongoing harm post-trial. *See* Mem. & Order on Plaintiff United States' Motion for a Civil Penalty and Injunctive Relief, *United States v. Koch*, 8:03-vc-00406-WKU-DLP (D. Neb. March 29, 2005) (Court ordering an injunction in 2005, where a jury found Defendant liable for pattern or practice of sexually harassing ten women from 1992 through 2003) (attached as Exhibit A). *See also*, Order Granting Injunctive Relief and Civil Penalty, *United States v. Ables*, 1:18-CV-01249-JDB-jay (W.D.

4

Tenn. May 8, 2023) (court ordering an injunction in 2023, where a jury found defendant liable for pattern or practice of sexually harassing five women from 2013 through 2020) (attached as Exhibit B); Order, *United States v. Peterson*, 2:09-CV-10333 (E.D. Mich. March 3, 2011) (court ordering an injunction in 2011, where a jury found defendant liable for pattern or practice of sexually harassing six women from 2006 through 2008) (attached as Exhibit C); *United States v. Veal*, 02-0720-CV-W-DW, 2005 WL 8158977 (W.D. Mo. January 28, 2005) (court ordering an injunction in 2005, where a jury found defendant liable for pattern or practice of sexually harassing ten women from 1992 through 2003); Opinion and Order, *United States v. L.T. Jackson*, 3:99-cv-556BN (S.D. Miss. June 11, 2022) (court ordering an injunction in 2002, where a jury found defendant liable for pattern or practice of sexually harassing 22 women from 1992 through 1999) (attached as Exhibit D).

Declining to enjoin Defendant McCarthy from operating housing will irreparably harm the United States' ability to protect the public from Defendant McCarthy's sexual exploitation of women. At trial, the jury heard evidence showing a wide range of harms, stretching from emotional distress, to distrust of recovery treatment providers, relapse of addiction, and overdose. The consequences of allowing Defendant McCarthy to interact with tenants are severe and life-threatening given the unique vulnerabilities of his tenants.

 2. **Longstanding Precedent Supports Ordering The Defendant To Retain A Private Management Company**

The United States' request that the Court require Defendant McCarthy to hire a private management company to operate his homes is reasonable and warranted given the jury's verdict. The purpose of an injunction is not to negatively affect Defendant McCarthy's livelihood or to preclude him from profiting from his sober homes. Rather, the purpose of an injunction is to protect the public and to protect the tenants in Defendant McCarthy's homes going forward.

Most private management companies charge based on a percentage of income, which is negotiable, and can be as little as 8-12%. *See e.g.* Jennifer Simonson, *How Much Do Property Managers Charge In 2024*, Forbes (August 1, 2024, 8:09 AM), https://www.forbes.com/advisor/business/software/how-much-property-managers-charge. Such an added expense would do little to disrupt Defendant McCarthy's profits, especially when compared to the harm he has caused.

      The Defendants are incorrect that the "only" similar cases in which the court imposed an injunction were those in which the parties settled. Dkt. No. 125 at 2. Courts have issued similar injunctions in cases after juries have found a defendant liable for violating the Fair Housing Act. In fact, since 2000, in *every* Fair Housing Act case involving allegations of sexual harassment where the United States has prevailed at trial, the court has ordered an injunction; in the sole instance where a court did not require the defendant to retain a private management company as part of that injunction, the defendant had already sold all of their properties and no longer operated as a landlord at the time of the court's order. *See supra* at 4-5. Though these cases were decided in other districts and are not binding on this Court, they are instructive.

      Here, the government asks this Court to do nothing more than to follow the example of numerous courts throughout the country when confronting similar circumstances. Given the egregious nature of the harm, the presumed irreparable harm, the limited nature of the government's proposed injunction (i.e., an injunction to prohibit active management, not ownership), and the minimal burden to the Defendants, the government's request is appropriate and necessary to protect the public. On the other hand, failure to impose such an injunction against this Defendant, under these circumstances, risks extraordinary harm to a vulnerable population with little (if any) justification.

3. **Defendant McCarthy's Voluntary Assertion That He Is No Longer A Danger To Violate The Fair Housing Act Is Misleading And Irrelevant—He Still Poses A Danger To The Public And Continues To Violate The Fair Housing Act By Harassing And Intimidating Witnesses Who Testified Against Him At Trial**

   a. *Defendant McCarthy Poses A Threat To The Public Because He Continues To Exercise Control Over Both His Female And Male Sober Homes*

The Defendants attempt to defeat injunctive relief by asserting that McCarthy poses no future danger of violating the Fair Housing Act because he no longer operates female homes and only operates male facilities. Dkt. No. 125 at 4. But the Court must "beware of efforts to defeat injunctive relief by protestations of repentance and reform" especially when the circumstances of any voluntary changes suggest the defendant merely seeks to avoid an injunction. *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952). In this case, on the same day that Defendants filed their Opposition Brief (Dkt. No. 117), disclaiming any involvement in female sober homes, Defendant McCarthy's Facebook profile picture featured an advertisement for sober living that contained a telephone number for male *and female beds*.[2] Exhibit E. And the Defendants omitted to mention that McCarthy appears to have placed his current girlfriend in charge of his women's homes,[3] rendering his statement that he no longer "operates" female homes at best misleading. In truth, he still exercises control over the homes.

Even giving Defendant McCarthy the benefit of the doubt, his current arrangement does not differ from his previous operational arrangements, where then-girlfriends "operated" the

---

[2] As with his *pro se* affidavit in which McCarthy attested to his financial distress based on questionable (at best) information, Defendants mislead the Court.

[3] McCarthy's Facebook page lists his girlfriend's phone number as the number to call for the women's homes. He has also made Facebook posts sharing that he is passing out fliers for both male and female homes in Worcester, Providence, New Hampshire, Massachusetts, and Maine, exclaiming that he is "a world wide thing." Exhibit F. Similarly, his girlfriend has posted advertisements for male, female, and couple's beds in Steps to Solutions homes on her own

Defendants' female sober homes—and in those same situations, the jury found that Defendant McCarthy preyed upon women. Further, his argument that he poses no threat simply because he only operates male sober homes is unpersuasive. After all, the jury found not only that he sexually harassed women, but also that he sexually exploited women by demanding sex from girlfriends *of men* within his *male sober homes*. So even if Defendant McCarthy solely operated male homes, as he suggests, he still poses a danger to the public.

      b. *Defendant McCarthy Poses A Threat Because He Continues To Harass And Intimidate Witnesses Who Testified Against Him At Trial, Which Violates The Fair Housing Act*

Additionally, since the trial, Defendant McCarthy has placed numerous social media posts targeting various witnesses who testified against him at trial. While Defendant McCarthy may appeal the jury's verdict and express his displeasure at the outcome of the trial, he may not intimidate, coerce, or harass the witnesses who testified against him at trial. 42 U.S.C. § 3617. Defendant McCarthy's social media posts, where he states that witnesses were paid by the government to make up stories, or where he states "They (sic) not even my type and I sure wouldn't make a move on them they wish," go well beyond expressing displeasure at the outcome of the trial, but verge into the type of harassing conduct that itself would violate the Fair Housing Act. The Court should at least admonish Defendant McCarthy, so that he refrains from this conduct. Unchecked, this behavior chills the likelihood of victims coming forward, not just in this case, but in other cases.

---

Facebook page, and when people reply to her posts inquiring for rooms, McCarthy himself responds. Exhibit G.

4. **The Court Should Award A Civil Penalty Because The Defendants' Mere Assertion Of Decreasing Revenue Hardly Meets Their Burden Of Establishing Financial Insecurity, And Because The Court Needs To Deter Other Landlords From Engaging In Similar Conduct**

The Defendants have yet to meet their burden of showing an impaired financial situation, and unless they do, the Court should not consider their finances when determining a civil penalty. Courts, including the First Circuit, routinely find that defendants bear the burden to demonstrate their financial situation when considering financial penalties. *See Horney v. Westfield Gage Co. Inc.,* 77 Fed.Appx. 24, 34 (1st Cir. 2003) ("Under Federal law, the burden of showing net worth is placed on the defendant."); *Fishman v. Clancy*, 763 F.2d 485, 490 (1st Cir. 1985) (placing the burden of making a record of the defendant's financial condition on the defendant to challenge a punitive damages award); *see also Motorola Credit Corp. v. Uzan,* 509 F.3d 74, 84 (2d Cir. 2007) ("it is the defendant's burden to show that his financial circumstances warrant a limitation of the award"); *United States v. Torres*, 209 F.3d 308, 312 (3d Cir. 2000) ("The defendant has the burden of proving his or her inability to pay.")

The Defendants provide the following information to argue for their diminished financial capacity: that Defendants have "decreasing revenue" and that Defendant McCarthy has a "reduc[ed] income." Dkt. No. 125 at 4. That's the sole quantum of information that the Defendants provide the Court to substantiate why the Court should award no civil penalty. The Defendant's self-serving word, alone, should not sway the Court's decision concerning imposing a civil penalty. Rather, the Court should require Defendant McCarthy to submit to the Court a complete Financial Disclosure Form, on both his behalf and on behalf of Defendant Steps to Solutions, under penalty of perjury and hold Defendant McCarthy accountable for any lies, misrepresentations, or omissions in his submission. Exhibits F and G. The Department of Justice has utilized financial disclosure forms for years in civil cases in performing an assessment of

9

defendants' claimed inability to pay. Conversely, if the Court merely accepts McCarthy's word on his purported inability to pay, there will be no incentive for him to tell the truth, and every incentive to dissemble.

The Defendants also argue that the imposition of a civil penalty would have no deterrent effect on Defendant McCarthy, given that the jury has already awarded $3.8 million in combined actual and punitive damages. Of course, whether the $3.8 million deters the Defendants turns, in the first instance, on their ability to pay the judgment. As of now, based on currently available information, that fact is unknown. To reiterate—McCarthy's word alone does not suffice to prove his purported inability to pay. And in the absence of that knowledge the Court should impose the appropriate penalty, after which point, the United States will proceed to attempt to collect on the judgment, subject to the Defendants' appeal rights and their payment of the appeal bond. The Defendants' argument also ignores the deterrent effect that such an award would have not just on Defendant McCarthy, but on other landlords. If the Court failed to hold Defendant McCarthy fully accountable, which the Court would do if it chose not to award a civil penalty, other unscrupulous landlords may draw the conclusion that they too could sexually exploit their tenants with impunity.

The ultimately purpose of a civil penalty is to punish the defendant. *Balistrieri*, 981 F.2d at 937 (7th Cir. 1992) ("Civil penalties and punitive damages serve a common purpose: to punish wrongdoing"). The jury awarded punitive damages to aggrieved parties to punish Defendant McCarthy's conduct towards each particular victim, but the award of a civil penalty goes further—it vindicates the public interest. 42 U.S.C. § 3614(d)(1)(C). A jury found that Defendant McCarthy committed heinous acts worthy of vindication and punishment. Imposing a civil penalty in the maximum amount of $127,983 would justly punish Defendant McCarthy for his

10

conduct and serve as a warning for others. That the Defendants already have been ordered to pay punitive damages to aggrieved parties does not relieve them of their burden to pay punitive damages to the United States—and that is all the more the case where the Defendants have offered very little information about their ability to pay and instead attempted to shift that burden improperly to the United States.

## CONCLUSION

For the aforementioned reasons, the Court should grant the United States' Motion for an Injunction and Civil Penalty (Dkt. No. 97); the Court should require that Defendant McCarthy retain a private management company to operate his sober homes; and it should assess a Civil Penalty of $127,983.

    Respectfully submitted,

    JOSHUA S. LEVY
    Acting United States Attorney
    District of Massachusetts

    */s/ Gregory J. Dorchak*
    GREGORY J. DORCHAK
    MICHELLE LEUNG
    EVE A. PIEMONTE
    Assistant U.S. Attorneys
    United States Attorney's Office
    Moakley U.S. Courthouse
    One Courthouse Way, Suite 9200
    Boston, Massachusetts 02210
    (617) 748-3100
    Gregory.Dorchak@usdoj.gov

Dated: August 20, 2024