## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>                  v.<br><br>PETER MCCARTHY,<br>STEPS TO SOLUTIONS, INC.<br><br>          Defendants. | No. 21-cv-11300-DLC |

### MEMORANDUM AND ORDER ON POST-TRIAL MOTIONS

CABELL, U.S.M.J.

## I.    Introduction

Defendant Peter McCarthy ("McCarthy") at all relevant times owned and operated a group of sober-living homes known as Steps to Solutions, Inc. ("Steps to Solutions"). Contending that he repeatedly harassed prospective and actual female tenants for sexual favors, the government sued McCarthy and his business for violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3614. Following a trial at which multiple witnesses testified, a jury returned a verdict in the government's favor and awarded several victims various amounts totaling $3,805,000 in compensatory and punitive damages.

Both parties have moved for post-trial relief. McCarthy moves for remittitur to reduce the overall damages award by almost 90

percent, to $450,000, leaving it to the court to determine how each victim's damages award should be modified.[1]  The government moves for injunctive relief to deter future violations and for the imposition of civil penalties.  For the reasons explained below, each motion is granted in part and denied in part.

## II. Analysis

### A. The Defendant's Motion for Remittitur

The jury awarded a total of $3,085,000 to seven victims whose encounters with McCarthy were described through direct testimony or the testimony of others.  McCarthy argues that this amount was grossly excessive; the government counters that it was not.  Ultimately, the court agrees that some of the amounts awarded were grossly excessive and they therefore shall be reduced, lowering the overall damages award to $1,420,000.

<u>Legal Framework</u>

When considering motions for remittitur, courts are "oblig[ated] to review the evidence in the light most favorable to the prevailing party." *Wortley v. Camplin*, 333 F.3d 284, 297 (1st

---

[1] McCarthy's motion for remittitur references Fed. R. Civ. P. 59 but it does not specify whether it pertains to Rule 59(a), which governs requests for a new trial, or Rule 59(e), which relates to motions to alter or amend a judgment.  As the motion is titled "Defendant's Motion for Remittitur," and such motions are typically classified under Rule 59(e), the court treats the motion as filed pursuant to Rule 59(e).  *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 141 F.Supp.3d 99, 112 (D. Me. 2015) (acknowledging that Rule 59(e) says "to alter or amend," but referring to the motion as one for remittitur).

Cir. 2003). A defendant seeking remittitur needs to do more than show that a damages award appeared to be generous; he must show that the award was "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *E. Mountain Platform Tennis v. Sherwin Williams Co., Inc.*, 40 F.3d 492, 502 (1st Cir. 1994); *Correa,* 69 F.3d at 1197, 1198 (defendant not entitled to remittitur absent a showing of a grossly excessive award).

There is no bright-line per se rule for determining whether an award is excessive. Rather, excessiveness is "often in the eye of the beholder." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1197 (1st Cir. 1995). Compensatory damages awards are notoriously hard to quantify in the absence of tangible losses, and for this reason, the jury is afforded significant deference in their award amounts. *Wagenmann v. Adams*, 829 F.2d 196, 216-217 (1st Cir. 1987); *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37-38 (1st Cir. 1988). It is not an exact science, and "translating [a plaintiff's] pain, suffering, and anguish into dollars . . . is a matter largely within the jury's ken." *Correa*, 69 F.3d at 1197. As such, the court cannot "sit as a super-juror, free to disregard the considered verdict of a properly instructed jury merely because he disagrees with it or would have found otherwise in a bench

trial." *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 236 (1st Cir. 2006).

Even so, the inherent difficulty in determining award amounts does not render the awards unreviewable. *Gardner v. Simpson Fin. Ltd. P'ship*, 963 F.Supp.2d 72, 88 (D. Mass. 2013). The Due Process clause of the Constitution's Fourteenth Amendment imposes substantive limits on the amount of punitive damages that may be imposed. *See e.g., TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 453-454 (1993) ("several of our opinions have stated that the Due Process Clause of the Fourteenth Amendment imposes substantive limits 'beyond which penalties may not go.'") (collecting cases); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). The same protections apply with equal force to federal court defendants through the Fifth Amendment. *See United States v. Neto*, 659 F.3d 194, 201 n.7 (1st Cir. 2011) (noting that "the language and policies of the Due Process Clauses of the Fifth and Fourteenth Amendments are essentially the same.").

In this context, due process requires that a defendant have fair notice of the severity of the penalties their conduct might incur. *Gore*, 517 U.S. at 574; *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) ("before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned."). Otherwise, punitive damages become grossly

4

excessive, and "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003); *Gore*, 517 U.S. at 574-575. Among the factors a court should consider are (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio between punitive damages and compensatory damages, and (3) the civil or criminal penalties that could be imposed for comparable misconduct. *Gore*, 517 U.S. at 574-575.

The first *Gore* factor, reprehensibility, is in practice often a court's primary concern, *see Gore*, 517 U.S. at 575, and encompasses a consideration of various factors, including: (1) the nature of the harm (physical versus economic), (2) whether the conduct demonstrates "indifference to or reckless disregard [for] the health and safety of others[,]" (3) whether the victim was financially vulnerable, (4) whether the conduct was an isolated incident or involved repeated actions, and (5) whether the harm resulted from "intentional malice, trickery, or deceit, or mere accident." *Quigley v. Winter*, 598 F.3d 938, 954 (8th Cir. 2010).

Regarding the second factor, the ratio between punitive and compensatory damages, courts must ensure that punitive damages "bear a reasonable relationship to compensatory damages," understanding that what constitutes a "reasonable relationship"

may differ depending on the case. *Gore*, 517 U.S. at 580; *Quigley*, 598 F.3d at 954. There is no bright-line rule delineating a constitutionally acceptable ratio, but precedent instructs that a ratio of four to one is "close to the line" of impropriety. *Campbell*, 538 U.S. at 425 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991); *Gore*, 517 U.S. at 581.); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 (1st Cir. 2001). Further, "when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Campbell*, 538 U.S. at 425.

Finally, concerning notice of the scope of penalties that may be imposed for comparable conduct, it bears noting that the FHA permits courts to impose civil penalties of up to $50,000 for a violation of the FHA, with penalties of up to $100,000 for subsequent violations. 42 U.S.C. § 3614(d)(1)(B).

The First Circuit provides that courts fashioning a remittitur comport with the "maximum recovery rule," which permits a remittance to the "highest reasonable total of damages for which there is adequate evidentiary support." *Marchant v. Dayton Tire & Rubber Co.*, 836 F.2d 695 (1st Cir. 1988). Alternatively, the court may order a plenary new trial, or a new trial limited to the issue of damages if it finds that the damages award resulted from

"passion and prejudice so virulent as to nullify the verdicts entirely." Fed. R. Civ. P. 59(a); *Wagenmann*, 829 F.2d at 216-217.

Applying these principles here, the court does not believe a new trial, even one limited to damages, is warranted, but does find that various awards were inordinately high and should be reduced.

## Discussion

The jury awarded damages to seven victims as follows: (1) Carrie Ann MacDougall, $105,000 in compensatory damages and $525,000 in punitive damages; (2) Jill Lovely, $115,000 in compensatory damages and $125,000 in punitive damages; (3) Mindy Mangini, $300,000 in compensatory damages and $875,000 in punitive damages; (4) Amanda Manning, $300,000 in compensatory damages and $875,000 in punitive damages; (5) Lauren Masse, $50,000 in compensatory damages and $25,000 in punitive damages; (6) Kelli Yeo, $150,000 in compensatory damages and $325,000 in punitive damages; and (7) Michael Fromer, $10,000 in compensatory damages and $25,000 in punitive damages.

As a threshold matter, McCarthy contends that none of the awards are justified because the government failed to prove that he violated any victim's rights under the FHA. Viewing this as a challenge to the sufficiency of the evidence, the court finds that the defendant has waived the argument because he did not raise it

in a timely motion for judgment as a matter of law or in a motion for a new trial.  The defendant did move for judgment as a matter of law but the court denied the motion as untimely without reaching any of the arguments on the merits.  (D. 144).

Against that backdrop, the court reviews each award in turn.

**1. Carrie Ann MacDougall**

Per her testimony, MacDougall resided at Steps to Solutions from December 2018 to February 2019.  About one month into her stay, McCarthy obtained MacDougall's phone number from her intake paperwork and contacted her via text message.  McCarthy repeatedly asked MacDougall for sexually explicit photos, which she provided because she feared she otherwise might be evicted, which would also violate a condition of her probation.  McCarthy also made inappropriate comments about MacDougall's body, gave her unwanted hugs, and (unsuccessfully) propositioned her for sex.  McCarthy's conduct caused MacDougall to leave Steps to Solutions.  Tr.2:19-63.

The jury awarded MacDougall $105,000 in compensatory damages and $525,000 in punitive damages.  McCarthy argues that the overall amount is excessive because MacDougall did not testify about her actual damages.  The court disagrees.  Compensatory damages include intangible harms and MacDougall testified about the emotional distress the defendant's conduct caused her.  She also testified

that she left the home in Lynn because McCarthy's escalating behavior made her feel "dirty". Her testimony also fairly allowed for an inference that she was at the very least extremely uncomfortable with McCarthy's sexual advances, hugs, and requests for sexually explicit pictures, given that she left because of his behavior and reported him to her doctor. In short, a jury could reasonably conclude from this evidence that McCarthy's actions caused MacDougall significant emotional distress. Though generous, the compensatory damages award here is not so high that it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Currier v. United Techs. Corp.*, 393 F.3d 246, 256 (1st Cir. 2004). For that reason, it stands.

Conversely, the court finds that the punitive damages award of $525,000 should be reduced to comport with the principles noted above. *Gore*, 517 U.S. at 574-575. To be sure, the court agrees that McCarthy's actions were reprehensible. He intruded on MacDougall's privacy by taking her phone number off intake paperwork and then repeatedly solicited her for sexual pictures and other inappropriate sexual requests. This conduct was undeniably intentional and showed clear disregard for MacDougall's mental state and sobriety. However, the court does not think the conduct was so reprehensible as to validate an award five times

higher than the compensatory award in light of the remaining *Gore* factors, which suggest that an award equal to one or two times the compensatory award would be more appropriate. Accordingly, the court will reduce the punitive damages to MacDougall to $105,000, equal to what she was awarded for compensatory damages, for a total award of $210,000.

### 2. Jill Lovely

Jill Lovely ("Lovely") was at Steps to Solutions from May 2021 to September 2021. She testified that McCarthy frequently made comments about her body and made her uncomfortable. He placed his hand on her thigh and her buttocks on two different occasions and solicited sexually explicit pictures (which she never sent). Lovely left the home in response to this conduct and never retrieved or was returned her personal belongings. Tr.1:26-53. The jury awarded her $115,000 in compensatory damages and $125,000 in punitive damages.

The court leaves the compensatory damages untouched. The award arguably is high but does not "exceed any rational appraisal or estimate of the damages that could be based upon the evidence before it." *Gardner*, 963 F.Supp.2d at 87. Along with testimony evincing emotional distress, the jury could have considered the economic loss Lovely suffered on account of her unreturned belongings.

The punitive damages award of $125,000, however, will be reduced to $60,000. McCarthy's conduct was, to be sure, reprehensible where the evidence showed he subjected Lovely to unwelcome physical contact and solicited sexually explicit pictures. That said, there was no evidence that Lovely was financially vulnerable, or that McCarthy demanded these favors in exchange for Lovely's continued tenancy, or that his conduct evinced "intentional malice, trickery, or deceit." Further, an award of $60,000 is more in line with the amount of damages that would be imposed for a violation of the statute.

For these reasons, the court leaves untouched the compensatory damages award of $115,000 but reduces the punitive damages award to $60,000, for a total of $175,000.

### 3. Mindy Mangini

Mindy Mangini ("Mangini") stayed at Steps to Solutions for three days in 2009, and then two months in 2013. She testified that McCarthy in 2019 required her to perform oral sex in exchange for the brief time she was there, and in 2013 negotiated an arrangement involving at least one encounter of sexual intercourse each month in lieu of paying rent. Mangini testified that they had sex according to this arrangement multiple times, which caused her emotional distress. She also stated that she relapsed after she left in 2013, although she was abusing substances before she

entered the home.  Tr.3:37-55.  The jury awarded Mangini $300,000 in compensatory damages and $875,000 in punitive damages.

The court leaves the compensatory damages award as it is but will reduce the punitive damages award.  Viewing the statutory damages scheme as instructive (but not controlling), and viewing the conduct here as evincing repeated violations of the FHA, McCarthy reasonably was on notice that his conduct could result in penalties of up to $150,000.  Given the reprehensibility of his conduct -- extorting sex on multiple occasions -- an award double that amount, and equal to the amount of compensatory damages, is justified.

In sum, the court declines to modify the $300,000 award of compensatory damages but reduces the punitive damages award to $300,000 as well, for a total of $600,000.

**4. Amanda Manning**

Amanda Manning ("Manning") stayed at Steps to Solutions for one day.  She testified via recorded deposition video that McCarthy demanded oral sex as payment and threatened to call her probation officer if she refused, causing her to flee the premises.  Manning testified that the encounter evoked traumatic memories of childhood sexual abuse and caused her to relapse after 5 years of sobriety.  Additionally, she claimed that she has not stayed at a sober living home since she left Steps to Solutions.  Parallelling

12

the damages awarded to Mangini, the jury awarded Manning $300,000 in compensatory damages and $875,000 in punitive damages, for a total of $1,175,000.

In light of the principles discussed above, the court will reduce Manning's compensatory damages award to $50,000 and her punitive damages award to $100,000.  McCarthy's conduct in using Manning's probation status to attempt to extort sex was undoubtedly egregious and impactful, particularly where it contributed to Manning's relapse.  That said, Manning's interaction with McCarthy was in context remarkably brief and involved no physical contact. A compensatory award of $50,000 and a punitive award twice that amount accords with notions of due process and proportionality. Accordingly, the court reduces Manning's total damages award from $1,175,000 to $150,000.

### 5. Lauren Masse

Lauren Masse ("Masse") resided at Steps to Solutions from January 2017 or 2018 for a few weeks -- the record is unclear as to the exact amount of time.  Masse passed away before trial but her mother-in-law, Sue McGonnigal ("McGonnigal"), testified about various phone calls she had with Masse during the relevant time period.  During one of those calls, Masse told her that McCarthy made her uncomfortable, which caused Masse to leave Steps to Solutions.  The jury also heard that McGonnigal told Masse to go

13

to Boston Medical Center because she was bleeding[2], and that after Masse left Steps to Solutions, she was homeless for two weeks and then went to a psychiatric institution for one month.  Tr.2:93-106.

The jury awarded Masse's estate $50,000 in compensatory damages and $25,000 in punitive damages.  McCarthy argues that the entire award should be set aside because the evidence at most suggested that McCarthy made Masse uncomfortable, which could encompass a range of lawful behavior.

McCarthy's argument overlooks McGonnigal's other testimony, from which, when viewed in a light most favorable to the government, the jury could have reasonably inferred a causal connection between McCarthy's actions and Masse's subsequent injuries after she left the home.  To that extent, the court is satisfied that the jury's award of $50,000 in compensatory damages is "within the universe of possible awards that are supported by the evidence in this case," and therefore declines to modify that award.  *Clark v. Taylor*, 710 F.2d 4, 14 (1st Cir. 1983).

Conversely, the court finds that the somewhat scant and amorphous evidence regarding Masse's interactions with the defendant does not warrant the imposition of punitive damages.

---

[2] There is no allegation or evidence that Masse's bleeding was related to her time at Steps to Solutions.

Punitive damages are never awarded as of right. *Smith v. Wade*, 461 U.S. 30, 52 (1983). Although the jury may have reasonably inferred and found from McGonnigal's testimony that McCarthy must have committed some act or acts that violated Masse's rights under the FHA, she nonetheless did not offer any testimony about any specific bad acts.[3] Hence, the court cannot assess whether McCarthy's actions demonstrated an "indifference to or reckless disregard [for Masse's] health and safety," nor can it determine any other factor to evaluate reprehensibility. *Gore*, 517 U.S. at 576. For that reason, the court vacates the award of punitive damages to Masse, leaving a total award of $50,000 in compensatory damages.

### 6. Kelli Yeo

Kelli Yeo ("Yeo") stayed at Steps to Solutions intermittently, from 2011 to 2014, for months at a time. She testified that when she missed rent payments, she sent McCarthy explicit pictures to avoid eviction. McCarthy did not expressly request the photographs but Yeo believed he implicitly expected them. In any event, she testified that McCarthy allowed her to stay at Steps to Solutions after receiving the pictures. Yeo testified that these experiences made her feel worthless and like

---

[3] To be clear, the government tried to elicit some evidence of specific acts but the court excluded it as inadmissible hearsay not subject to an exception.

an object, and ultimately led her to relapse.   Tr.3:6-36.   The jury awarded Yeo $150,000 in compensatory damages and $325,000 in punitive damages.

The court does not deem the $150,000 compensatory damage award, although arguably high, to be so grossly excessive that it shocks the conscience, particularly where the defendant accepted explicit nude photos from a vulnerable tenant in lieu of rent, and therefore declines to reduce that award.   However, the court will reduce the punitive damages award to $50,000 in light of the *Gore* factors noted above.   Again, McCarthy's conduct in accepting explicit pictures at times in lieu of rent was reprehensible, but it was not as egregious as in other instances with other victims, and an award of $50,000 also aligns with what the statute would provide for if damages were imposed thereunder.

Accordingly, the court will not modify the compensatory award but will reduce the punitive damages award to $50,000, for a total of $200,000.

### 7. Michael Fromer

Michael Fromer ("Fromer") stayed at Steps to Solutions for at least three months in 2018.   He testified that whenever he failed routine drug tests, an event warranting eviction, his girlfriend Rebecca Kennedy would have sex with McCarthy to prevent Fromer's eviction.   Fromer testified that this happened on multiple

16

occasions and the arrangement made him feel "less than a man" and "took his soul."  The jury awarded Fromer $10,000 in compensatory damages and $25,000 in punitive damages.  The court does not find either amount to be grossly excessive and leaves this award untouched.

In sum, the court reduces the jury's total damages award from $3,805,000 to $1,420,000.  This award, in the aggregate, comprises $780,000 in compensatory damages and $640,000 in punitive damages.  Specifically, Carrie Ann MacDougall's award is reduced from $630,000 to $210,000; Jill Lovely's award is reduced from $240,000 to $175,000; Mindy Mangini's award is reduced from $1,175,000 to $600,000; Amanda Manning's award is reduced from $1,175,000 to $150,000; Lauren Masse's award is reduced from $75,000 to $50,000; Kelli Yeo's award is reduced from $475,000 to $200,000; Michael Fromer's award of $35,000 remains the same.

In imposing remittitur, the court gives McCarthy the choice to accept or reject the reduced damages award.  *See D'Pergo Custom Guitars, Inc., v. Sweetwater Sound, Inc.*, 111 F.4th 125, 139 n.10 (1st Cir. 2024); *Bisbal-Ramos v. City of Mayaguez*, 467 F.3d 16, 26 (1st Cir. 2006) ("[A] conventional remittitur . . . requires giving the plaintiff a choice between accepting a reduced damage award and a new trial").  Proceeding otherwise "cannot be squared with the Seventh Amendment."  *Hetzel v. Prince William Cnty.,* 523 U.S.

17

208, 211-212 (1998).  If McCarthy rejects the remitted amount, a new trial on damages must be held.  *Id.; Marchant*, 836 F.2d at 704.

**B. Government's Motion for Injunctive Relief and Civil Penalties**

The government requests that the court grant an injunction prohibiting McCarthy going forward from discriminating against others based on sex, which includes coercing, intimidating, threatening, or interfering with housing rights in violation of the FHA.  Going a step further, the government also asks the court to require McCarthy to retain an independent property manager, approved by the government, that would handle all aspects of managing his rental properties.  The court will grant the request for an injunction but deny the request that McCarthy hire a monitor.

A court may order equitable relief in the form of a permanent injunction when the plaintiff shows:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

> *eBay Inc. v. MercExchange L.L.C.*, 547 U.S. 388, 391 (2006).

At the outset, it bears noting that Congress passed the FHA with "broad remedial intent." *Revock v. Cowpet Bay West Condo. Ass'n.*, 853 F.3d 96, 110 (3rd. Cir. 2017). Federal courts have wide latitude to provide equitable relief in FHA cases, including affirmative relief when appropriate. *E.g.*, *United States v. West Peachtree Tenth Corp.*, 437 F.3d 221, 228 (5th Cir. 1971) (holding that § 3613 of the FHA "includes the power to grant affirmative relief"); *Metro. Hous. Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1011 (7th Cir. 1980) ("Generally, and particularly in a fair housing situation, the existence of a federal statutory right implies the existence of all measures necessary and appropriate to protect federal rights . . . ."); *United States v. City of Parma*, 661 F.2d 566, 576 (6th Cir. 1981) ("The affirmative provisions of the remedial order are not as unusual as [defendant] suggests in its brief. Most, if not all of those provisions have been incorporated in decrees of various courts which have decided Fair Housing Act cases.").

In the event of a rights violation, federal courts must employ "all reasonable methods . . . to achieve the greatest possible degree of relief, taking into account the practicalities of the situation." *Hills v. Gautreaux*, 425 U.S. 284, 297 (1976) (internal citations omitted). However, this power is not absolute. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 28 (1971) ("No

fixed or even substantially fixed guidelines can be established as to how far a court can go, but it must be recognized that there are limits."). A federal court must "carefully tailor" the remedy, "limiting it to [the] relief necessary to correct the violations." *Parma*, 661 F.2d at 576.

As encapsulated in *Swann*, "the task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." 402 U.S. at 16. Although *Swann* refers to constitutional violations, the same rings true for FHA violations because they too are governed by traditional principles of equity. *Park View Heights Corp. v. City of Black Jack*, 605 F.2d 1033, 1036 (8th Cir. 1979); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 149 (3rd Cir. 1977) ("Thus, just as we must be careful to structure and limit equitable relief in cases involving violation of constitutional rights, so too must we be similarly cautious . . . in tailoring the remedy here to that which is necessary to correct the statutory violation found.").

Against this backdrop, the court believes it is appropriate to permanently enjoin McCarthy from discriminating based on sex or coercing, intimidating, threatening, or interfering with the exercise of housing rights in violation of the FHA. The court

also permanently enjoins McCarthy from engaging in direct contact with current or prospective tenants.

Given this injunction, the court does not deem it necessary to require McCarthy to hire an independent property manager or monitor to prevent future FHA violations of the sort underlying this action.  While the government's proposed solution generally aligns with the FHA's remedial purpose, a carefully tailored remedy should evaluate whether "less drastic remedies . . . could achieve that goal." *BMW of N. Am. v. Gore*, 517 U.S. 559, 584 (1996).  In the court's opinion, this narrowly tailored remedy is preferable to the government's request for an independent property manager. Similar affirmative relief has historically been imposed in cases where discrimination is part of an institutional policy, or deeply embedded in the entity's structure. *See West Peachtree*, 437 F.2d at 228 (implementing affirmative program to remedy racially discriminatory housing policy); *see also Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 418-420 (1977) (characterizing lower court's sweeping integration plan as overbroad because segregation policy has already ceased); *Parma,* 661 F.2d at 578-579 (rejecting the necessity of a special master to oversee compliance with municipality's remedial plan). Although McCarthy owns Steps to Solutions, McCarthy is ultimately one individual, and Steps to Solutions has not discernibly adopted McCarthy's course of

misconduct as its *modus operandi*.  The testimony of various house managers confirms this.  Thus, this portion of the government's request is denied.

Finally, regarding the government's request for the imposition of civil penalties, the court does not believe that further civil penalties are necessary given the damages awarded, even as reduced here.  This request therefore is denied.

### C. Conclusion

In light of the foregoing, the defendant's motion for remittitur (D. 95) is <u>granted in part</u> and <u>denied in part</u>.  Pursuant to Fed. R. Civ. P. 59, the court remits the damages award from $3,805,000 to $1,420,000 as set forth above.  McCarthy now has the choice of a new trial or acceptance of remittitur.  McCarthy shall inform the court by January 3, 2025 whether he seeks a new trial on the issue of damages.  If not, judgment shall enter in the amount of $1,420,000.

As well, the government's motion for injunctive relief and a civil penalty (D. 97) is <u>granted in part</u> and <u>denied in part</u>.  The court declines to impose civil penalties but grants the following injunctive relief:

Defendant Peter McCarthy is permanently enjoined from discriminating against others based on sex or coercing, intimidating, threatening, or interfering with the exercise of

housing rights in violation of the FHA.  42 U.S.C. §§ 3601 et seq. McCarthy is also permanently enjoined from engaging in direct contact with current or prospective tenants.


**_So Ordered._**                          /s/ Donald L. Cabell
                                           DONALD L. CABELL, U.S.M.J.

DATED:  December 26, 2024