UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 21-11300-DLC |
| PETER MCCARTHY and STEPS TO SOLUTIONS, INC., | ) | |
| Defendants | ) | |

**THE UNITED STATES' SECOND MOTION
FOR RECONSIDERATION OF THE COURT'S
<u>ORDER ON DEFENDANT MCCARTHY'S MOTION FOR REMITTITUR</u>**

In recalculating punitive damages for the victims of Defendant Peter McCarthy's pattern or practice of sexual harassment under the Fair Housing Act, the Court erred in relying upon an outdated civil monetary penalty for the Fair Housing Act ("FHA"), using the amount allowed by the FHA in 1988 rather than the current amount. The Court also erred in lowering both the compensatory and punitive damages for Amanda Manning by failing to consider the full scope of physical harm McCarthy caused when he triggered a relapse of sobriety for Ms. Manning and McCarthy's reckless indifference to her health and safety. For these reasons, the United States requests that the Court (i) recalculate punitive damages for McCarthy's victims using the current civil monetary penalty for the FHA in its calculus and (ii) reinstate the compensatory damages the jury awarded for Ms. Manning, as well as provide her punitive damages that align with the punitive damages awarded to Mindy Mangini, as the jury intended.

## I.     BACKGROUND

Following a five-day jury trial, on May 17, 2024, a jury returned a verdict finding that Defendant Peter McCarthy engaged in a pattern or practice of sexual harassment under the FHA and awarded $3,805,000 in damages to seven aggrieved parties: $1,030,000 in compensatory damages and $2,775,000 in punitive damages. Doc. 91. McCarthy filed a motion for remittitur on May 24, 2024. Doc. 95. On December 26, 2004, the Court granted McCarthy's motion in part, remitting damages from $3,805,000 to $1,420,000. Doc. 145. In its Order, the Court reduced punitive damages for all but one aggrieved party: Michael Fromer. The Court also reduced compensatory damages for one aggrieved party: Amanda Manning.

## II.     STANDARD FOR RECONSIDERATION

This court "is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of Civil Procedure 59(e) and 60(b)," which govern a district court's reconsideration of its final judgments. *Spring Creek Expl. & Prod. Co. v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1024 (10th Cir. 2018), *as revised* (Apr. 13, 2018). Rather "[A] district court has the inherent power to reconsider its interlocutory orders." *Fernandez-Vargas v. Pfizer*, 522 F.3d 55, 61 n.2 (1st Cir. 2008) (citing *Warren v. Amer. Bankers Ins.*, 507 F.3d 1239, 1243 (10th Cir. 2007)). Nonetheless, some courts in the First Circuit have relied on the standards for Rule 59(e) or Rule 60(b) motions to amend a judgment in deciding motions for reconsideration of interlocutory orders. *See, e.g.*, *In re Telexfree Sec. Litig.*, 652 F. Supp. 3d 233, 235 (D. Mass. 2023); *Golub v. Ne. Univ.*, No. 19-CV-10478-ADB, 2020 WL 3086050, at *4 (D. Mass. June 10, 2020), *aff'd,* No. 20-1674, 2021 WL 6425374 (1st Cir. July 20, 2021). Under those rules, a party may move for reconsideration of a court order on the grounds of mistake. Fed. R. Civ. P. 60(b)(1). "As a general matter, a motion for reconsideration may only be granted

if the original judgment evidenced a manifest error of law, or if there is newly discovered evidence, or in certain other narrow situations." *Kenn v. Eascare, LLC*, No. 1:20-cv-10070, 2021 WL 12227952, at *1 (D. Mass. Apr. 12, 2021) (granting motion for consideration where plaintiff identified an error of law) (quoting *Global Naps, Inc. v. Verizon New England, Inc.* 483 F.3d 13 (1st Cir. 2007)).

### III.     ARGUMENT

**A.     The Court erred in recalculating punitive damages for Mindy Mangini, Jill Lovely, Carrie Ann MacDougall, and Kelli Yeo because it relied on an outdated statutory civil penalty.**

In issuing its Order on the parties' post-trial motions, Doc. 145, the Court reassessed punitive damages for most of the seven aggrieved parties, relying on the *Gore* factors that courts use to consider when assessing whether a jury awarded excessive punitive damages. *BMW of N. Am., Inc., v. Gore,* 517 U.S. 559 (1996). *Gore* sets forth the following factors: (1) the degree of reprehensibility of a defendant's conduct; (2) the ratio between the compensatory and punitive damages; and (3) the amount of civil and criminal penalties that could be assessed for similar conduct. *Id.* at 574-75.

In applying this final factor, the Court used an incorrect dollar amount to calculate punitive damages, and this mistake skewed the Court's recalculation of punitive damages across the board. The Court articulated that in calculating punitive damages, it used the penalty Congress established for the FHA when the Fair Housing Amendments Act was enacted in 1988: "It bears noting that the FHA permits courts to impose civil penalties of up to $50,000 for a penalty of the FHA, with penalties of up to $100,000 for subsequent violations." Doc. 145 at 6. The Court relied on amounts that, while accurate in 1988, are no longer accurate. The original statutory maximums provided in 42 U.S.C. § 3614(d)(1)(C) are adjusted annually for inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104

3

Stat. 890. *See* 28 C.F.R. §§ 85.3, 85.5. For penalties assessed after February 2, 2024, a first violation of the FHA results in a penalty of up to $127,983 and subsequent violations result in penalties of up to $255,964. These penalties are now slightly more than 2.5 times the amount they were in 1988.

Throughout its analysis the Order incorrectly relied upon the FHA's 1988 penalties in recalculating punitive damages, which resulted in lower punitive damages amounts. For example, when reducing punitive damages awarded to Mindy Mangini from $875,000 to $300,000, the Court stated: "viewing the conduct here as evincing repeated violations of the FHA, McCarthy was reasonably on notice that his conduct could result in penalties of up to $150,000." Doc. 145 at 12. Given the reprehensibility of his conduct towards Ms. Mangini—repeated sexual extortion—the Court justified doubling this amount of $150,000 to $300,000. Doc. 145 at 12.

In other words, the Court added the sum of a first violation ($50,000) and a subsequent violation ($100,000) to arrive at $150,000 and then doubled this to $300,000 based on reprehensibility. Replicating the Court's calculation using the inflation-adjusted, and current, civil monetary penalties of $127,983 for a first violation and $255,964 for subsequent violations, McCarthy would have been on notice that his conduct could result in penalties of at least $383,947 ($127,983 + $255,964) for his actions towards Ms. Mangini. As the Court doubled this based on reprehensibility, McCarthy should be liable for $767,894 ($383,947 x 2) in punitive damages.

Similarly, the Court applied incorrect numbers to its reduction of punitive damages awarded to Jill Lovely. The Court reduced punitive damages from $125,000 to $60,000 noting that "an award of $60,000 is more in line with the amount of damages that would be imposed for

4

a violation of the statute." Doc. 145 at 11. Given that the Court reduced the penalty awarded to Ms. Lovely to align more closely with the civil penalty that the FHA allows for a first violation, and given that the Court used the incorrect penalty of $50,000 rather than the correct penalty of $127,983, the United States proposes that the Court return the punitive damages awarded to Ms. Lovely to $125,000, which is approximately the current civil penalty amount for a first FHA violation.

The Court relied upon this incorrect calculus throughout its Order. The United States proposes that, given this error underpinning the Court's calculation, the Court recalculate punitive damages as follows:

| Name | Original Jury Award of Punitive Damages | Court's Recalculation of Punitive Damages Factoring the Incorrect Civil Penalty of $50,000 | United States Proposed Recalculation of Punitive Damages Factoring the Correct Civil Penalties of $127,983 and $255,964. |
|---|---|---|---|
| Mindy Mangini | $875,000 | $300,000 | **$767,894** |
| Jill Lovely | $125,000 | $60,000 | **$125,000** |
| Carrie Ann MacDougall | $525,000 | $105,000 | **$268,762** |
| Kelli Yeo | $325,000 | $50,000 | **$127,983** |

5

**B.     The Court erred in reducing the damages, both compensatory and punitive, awarded to Amanda Manning by more than a million dollars.**

The Court failed to address the harm caused to Amanda Manning when lowering both compensatory and punitive damages awarded to her by the jury. The jury awarded Ms. Manning $300,000 in compensatory damages and $875,000 in punitive damages, mirroring the amount it awarded to Mindy Mangini. Notably, Ms. Manning and Ms. Mangini were the only two aggrieved parties who provided direct testimony that McCarthy made explicit demands to provide sexual acts in exchange for housing. *See* Tr. 3:40-55 and Amanda Manning Video (hereafter "AMV").[1] The Court reduced Ms. Manning's compensatory damages from $300,000 to $50,000 noting that "Manning's interaction with McCarthy was in context remarkably brief and involved no physical contact." Doc. 145 at 13. Similarly, the Court reduced Ms. Manning's punitive damages from $875,000 to $100,000 stating that the reduction "accords with notions of due process and proportionality." Doc. 145 at 13.

When Ms. Manning sought housing from McCarthy's recovery program, she realized she lacked the up-front money that McCarthy required. AMV 01:40. Ms. Manning testified that McCarthy gave her the impossible choice of either having sex with him in exchange for housing or dealing with the consequences of McCarthy calling her probation officer. AMV 01:40. Ms. Manning testified that McCarthy stroked her neck and head when making the proposal, which also made her feel uncomfortable. AMV 03:13. Rather than accepting this double-bind, Ms. Manning testified that she fled from the recovery program, and as a direct result of this, her "addiction spiraled out of control." AMV 01:51. She testified that because of this encounter, she

---

[1] The video testimony of Ms. Manning was neither transcribed by the court reporter nor marked as an exhibit, so for clarity we will refer to the relevant timestamp of the cited testimony from the video provided to the Court.

6

has never again sought help in a sober home. AMV 03:38. She testified that this "could have been her shot" to maintain sobriety, but that instead, McCarthy triggered her onto a path where her addiction took control of her life. AMV 01:51. By virtue of its verdict, the jury plainly credited Ms. Manning's testimony.

1. **When assessing compensatory damages, the Court should consider the nature of the harm that McCarthy caused, rather than the brevity of the interaction between McCarthy and Amanda Manning.**

The Court, in reducing the compensatory damages awarded to Ms. Manning, focused on the *brevity of the interaction* between her and McCarthy. Instead, the Court should have focused on the *nature of the harm* Ms. Manning experienced based on McCarthy's conduct. "Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, (2003).

Victims of housing discrimination may have pre-existing emotional conditions caused by some incident that occurred prior to their interaction with the defendant. In fair housing cases, defendants must "take their victims as they find them; damages are measured based on the injuries actually suffered by the victim, not on the injuries that would have been suffered by a reasonable or ordinary person." *See United States Dep't of Housing and Urban Dev. v. Schilling*, HUDALJ 04-92-0440-1, 1993 WL 263667, at *10 (HUD ALJ July 15, 1993); *see also Curtis*, 415 U.S. at 195 ("[A] damages action under the [Fair Housing Act] sounds basically in tort…"); *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 506 (1st Cir. 1996) (defendant must "take the victim as [defendant] finds [the victim], extraordinarily sensitive or not"); *Shimman v. Frank*, 625 F.2d 80, 100 (6th Cir. 1980) (cleaned up) (noting that defendants must take their victim as they find them); *Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112 (D. Kan. 2017) (upholding

the application of the "Eggshell Skull" principle that requires the jury account for an aggrieved person's pre-existing condition, which may have made her more susceptible to damages, when determining the proper amount of compensatory damages in a sexual harassment and retaliation case) (cleaned up); *Jenson v. Eveleth Taconite Co.* 130 F.3d 1287, 1294-95 (8th Cir. 1997) (recognizing the principle that tortfeasor takes his victims as he finds them).

Though McCarthy did not cause Ms. Manning's addiction, he is no less liable for any harm he caused when he triggered her relapse. After all, he knew full well that his sober home residents confronted significant challenges in achieving and maintaining sobriety. Not only was the harm to Ms. Manning and others like her foreseeable, but McCarthy was acutely aware of the fragile state of the residents of his homes. In this context, the Court's focus on the brevity of the interaction misses the point. McCarthy knew what he was doing, and he *preyed on the vulnerability* of the aggrieved parties here, including Ms. Manning. The fact that he was able to effect so much harm in such a short window of time only underscores that Ms. Manning's sobriety rested on a knife's edge—a fact about those in recovery that McCarthy knew. Rather than help her, McCarthy employed his knowledge of her situation to exploit her, and the consequences for her were manifold and devastating, and they reverberate to this day.

Though she had had five years of sobriety prior to meeting McCarthy, his actions caused Ms. Manning's addiction to "spiral out of control" for years. AMV 01:51. His actions affected her health—she suffered a relapse. AMV 01:51. His actions affected her relationship with her family. AMV 02:00. His actions continue to threaten her life, because the very real potential of another relapse remains. McCarthy's conduct was a (more than) foreseeable cause of all these harms that Ms. Manning suffered and continues to suffer. And indeed, the jury's considered verdict confirms that it understood the full scope of the harm here. The Court erred in not

considering the nature, scope, and effects of these long-lasting harms that McCarthy caused to Ms. Manning. In light of the above, the Court should reinstate the jury's award of $300,000, which compensates Ms. Manning for the years of sobriety she lost because of McCarthy's actions. If the Court is not inclined to reinstate the jury's award in full, the Court should nevertheless revisit the amount it awarded.

**2.      The Court misapplied the *Gore* Factors when recalculating punitive damages awarded to Amanda Manning.**

In recalculating punitive damages for Ms. Manning, the Court also misapplied the *Gore* factors. Specifically, the Court misapplied the first *Gore* factor: reprehensibility. In *Gore*, the Supreme Court outlined reprehensibility as "[p]erhaps the most important indicium of the reasonableness of a punitive damages award[.]" *Gore*, 517 U.S. at 575. When considering reprehensibility, the Court can take a number of factors into account: (1) the nature of the harm (physical vs. economic); (2) indifference to or reckless disregard for the health and safety of others; (3) the financial vulnerability of the victim; (4) whether the conduct was isolated or involved repeated actions; and (5) whether the harm resulted from malice, trickery, or deceit, or was in the alternative mere accident. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003). The Court misapplied the first of these five reprehensibility factors (considering the nature of the harm) and omitted considering the second reprehensibility factor altogether (McCarthy's indifference to or reckless disregard for the health and safety of others).

The Court incorrectly interpreted the *Gore* reprehensibility factor to mean only that a physical *interaction* must take place, when it actually requires an assessment of whether a victim experienced physical *harm*—the two concepts are distinct, as highlighted above. *State Farm Mut. Auto. Ins.*, 538 U.S. at 409 ("To determine a defendant's reprehensibility—the most important indicium of a punitive damages award's reasonableness—a court must consider

9

whether: the *harm* was physical rather than economic[…]) (emphasis added). Here, the Court should consider the years-long relapse of sobriety that McCarthy caused. This relapse was a physical manifestation of the harm that McCarthy visited upon Ms. Manning.[2]

At trial, Dr. Hanni Stoklosa testified that most women who sought residence in McCarthy's sober homes shared vulnerabilities: they were women with substance use disorder and clinically, Dr. Stoklosa noted that this meant that many likely had experienced abuse in their home and that they likely had sexual exploitation normalized in their life. Tr. 3:75:19-76:10. Additionally, they all shared a particular vulnerability for shelter and likely lacked social safety nets. Tr. 3:75:19-76:10. Dr Stoklosa opined on the nature of harms that McCarthy's behaviors had the potential to cause ranging from lifelong internalized shame, to posttraumatic stress disorder, depression, suicidal ideation, and potential relapse from sobriety. Tr. 77:19-80:1. These potential consequences speak to the reckless indifference that McCarthy demonstrated to the health and safety of each of the aggrieved parties—the second factor the Court should consider when calculating the degree of reprehensibility of a defendant's actions. The Court erred in not considering these potential health consequences, and McCarthy's utter disregard for these consequences, when calculating McCarthy's reprehensibility. In the case of Ms. Manning, the harm McCarthy caused was near the most extreme possible health consequence, as her relapse from sobriety could have easily resulted in a fatal drug overdose.

Given that Ms. Manning experienced significant physical harm resulting from McCarthy's reckless indifference towards her health, and given that the actual civil penalties

---

[2] The Court also erred in finding that no physical interaction took place between Ms. Manning and McCarthy. Doc. 145 at 13. Ms. Manning testified that McCarthy stroked her neck as he gave her his ultimatum. AMV 03:13.

available for an FHA violation are $127,983 for a first violation and $255,964 for a subsequent violation, the Court should recalculate the punitive damages awarded to Amanda Manning, and make it equivalent to that which Court awards to Mindy Mangini, as the jury originally intended. In the alternative, the Court should recalculate the punitive damages awarded to Amanda Manning after considering the errors identified here by the government.

## IV.   CONCLUSION

For the reasons stated above, the Court should recalculate punitive damages accounting for the current amounts allowed for by the FHA and should reinstate the jury's award of $300,000 in compensatory damages for Amanda Manning and award her punitive damages equivalent to what the Court awards to Mindy Mangini.

Dated: January 24, 2025

Respectfully submitted,

LEAH B. FOLEY
United States Attorney
District of Massachusetts

*/s/ Gregory J. Dorchak*
GREGORY J. DORCHAK
MICHELLE LEUNG
EVE A. PIEMONTE
Assistant U.S. Attorneys
United States Attorney's Office
Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
Gregory.Dorchak@usdoj.gov